BRENT J. NEWELL (State Bar No. 210312)
LAW OFFICES OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Tel: (661) 586-3724
brentjnewell@outlook.com

Attorney for Plaintiffs
Central California Environmental
Justice Network, Committee for a Better Arvin,
Medical Advocates for Healthy Air, and
Healthy Environment for All Lives

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| CENTRAL CALIFORNIA ENVIRONMENTAL JUSTICE NETWORK, a nonprofit corporation, COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, MEDICAL ADVOCATES FOR HEALTHY AIR, a nonprofit corporation, and HEALTHY ENVIRONMENT FOR ALL LIVES, an unincorporated association,<br><br>          Plaintiffs,<br><br>     v.<br><br>LIANE RANDOLPH, in her official capacity as Chair of the Air Resources Board, STEVEN CLIFF, in his official capacity as Executive Officer of the Air Resources Board, SANDRA BERG, JOHN EISENHUT, DANIEL SPERLING, JOHN BALMES, DIANE TAKVORIAN, DEAN FLOREZ, HECTOR DE LA TORRE, DAVINA HURT, BARBARA RIORDAN, PHIL SERNA, NORA VARGAS, TANIA PACHECO-WERNER, and GIDEON KRACOV, in their official capacities as Board Members of the Air Resources Board, CONNIE LEYVA and EDUARDO GARCIA, in their official capacities as *Ex Officio* Board Members of the Air Resources Board, SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT, and the GOVERNING BOARD OF THE SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT,<br><br>          Defendants. | Case No. 2:22-cv-01714-TLN-CKD<br><br>Date:  January 12, 2023<br>Time: 2:00 pm<br><br>Courtroom 2<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# Table of Contents

Table of Authorities……………………………………………………………………………ii

I.      Introduction………...……………….……………………………….…………1

II.     Statement of Issues…………………………………………………………. 1

III.    Statutory Background. ……………………………………………………….2

IV.     Statement of Facts………………………………………………………………5

V.      Jurisdiction and Standing…………………………….……………………7

    A.      Defendants' failure to develop, adopt, and submit attainment
    contingency measures injures Valley EJ Organizations' members……..………9

    B.      Valley EJ Organizations members' injuries are fairly traceable to
    Defendants' failure to develop, adopt, and submit attainment
    contingency
    measures……………………………………………….……………………11

    C.      The relief sought will redress Valley EJ Organizations members' injuries. ……12

VI.     Argument……………………………………………….…………………....13

    A.      Summary judgment standard……………………………………….…..……13

    B.      The commitment to develop, adopt, and submit by 2020 attainment
    contingency measures and advanced technology contingency measures
    is an emission standard or limitation and an enforceable SIP strategy……..……14

    C.      Defendants violated an emission standard or limitation when Defendants
    failed to develop, adopt, and submit attainment contingency measures…………17

    D.      The Court should order Defendants to develop, adopt, and submit
    attainment contingency
    measures…………………………………………….……………………19

VII.    Conclusion………………………………………….…………….…………20

**Table of Authorities**

**Cases**

*Abramowitz v. EPA*, 832 F.2d 1071 (9th Cir. 1987)………...…………………………………..9

*Acosta v. City Nat'l Corp.*, 922 F.3d 880 (9th Cir. 2019)………..…………………..…………………..13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)…..……………………..………………..13

*Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d 858 (9th Cir. 2016) …..………8

*Association of Irritated Residents v. U.S. Environmental Protection Agency*,
        10 F.4th 937 (9th Cir. 2021) …………………………………………………………*passim*

*Association of Irritated Residents v. EPA*, 686 F.3d 668 (9th Cir. 2012)…………………………2

*Association of Irritated Residents v. C&R Vanderham Dairy*,
        2007 WL 2815038 (E.D. Cal. Sept. 25, 2007) …..………………………………………..9

*Bahr v. EPA*, 836 F.3d 1218 (9th Cir. 2016) …..………………………………..…………….4, 20

*Bayview Hunters Point Community Advocates v. Metropolitan Transp. Comm'n*,
        366 F.3d 692 (9th Cir. 2004) …..…………………………………………………….3

*BCCA Appeal Group v. U.S. EPA*, 355 F.3d 817 (5th Cir. 2003) ………………………...……………15

*Bernhardt v. County of Los Angeles*, 279 F.3d 862 (9th Cir. 2002) ………..…………...…………11

*Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166 (9th Cir. 2002) ………………...……...11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) …………………………………………...….……13

*Clean Air Council v. Mallory*, 226 F.Supp.2d 705 (E.D. Penn. 2002) ……………………...……..8

*Committee for a Better Arvin v. EPA*, 786 F.3d 1169 (9th Cir. 2015) ……….…….…………..15, 16

*Delaney v. EPA,* 898 F.2d 687 (9th Cir. 1990) ……………………………………...………….9

*El Comité para el Bienestar de Earlimart v. Helliker*, 416 F.Supp.2nd 912 (E.D. Cal. 2006) …..………9

*El Comité para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062 (9th Cir. 2008) ………………15

*El Comité para el Bienestar de Earlimart v. U.S. Environmental Protection Agency*,
        786 F.3d 688 (9th Cir. 2015) ………………………………………………...….………18

*Environmental Defense Fund v. EPA*, 369 F.3d 193 (2d Cir. 2004) ………………………...…………15

*Ex Parte Young*, 209 U.S. 923 (1908) …………………………………………………...…………8

*Friends of the Earth v. Carey,* 535 F.2d 165 (2nd Cir. 1976) …………….....…………....……………2, 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ……………………....……9

*General Motors Corp. v. U.S.*, 496 U.S. 530 (1990) …………………………....……....…......……………2

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) …………………………………….……....……....…………9

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ……...……………....…8

*Larson v. Valente,* 456 U.S. 228, 244 (1982) …………………………....…………………………………13

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) …………………………………….…...……………9, 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ………………………………14

*Natural Resources Defense Council v. EPA,*

    507 F.2d 905 (9th Cir. 1974) …………………………………………………………....……………9

*Natural Resources Defense Council v. California Department of Transportation,*

    96 F.3d 420 (9th Cir. 1996) ……………………………………………....……………8

*Ober v. EPA*, 84 F.3d 304 (9th Cir. 1996) ……………………………………………………....…9

*Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.,*

    913 F.2d 64 (3d Cir. 1990) …………………………………………………....……………11

*Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 200…………………………………...2, 17, 19

*Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012). …………………………………………………………2

*Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004)…………………………………………....…………3

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ……………………………………………….……....……10

*United States v. Oakland Cannabis Buyers' Co-Op.*, 532 U.S. 483 (2001) ……………….…………20

*United States v. SCRAP*, 412 U.S. 669 (1973) ……....…………………………………….…....………10

*Vigil v. Leavitt*, 366 F.3d 1025 (9th Cir. 2004) …………………………………....…………………2

*Warth v. Seldin,* 422 U.S. 490 (1975) …………………………………………………….…....……………11

**Statutes**

42 U.S.C. § 7401…………………………………....……………………………...……………2

42 U.S.C. § 7409…………………………………………....………………………...…………2

42 U.S.C. § 7410(a)(1) ……………………………………………………………...……………2

42 U.S.C. § 7410(k) ……………………………….....……………………...……...…..2

42 U.S.C. § 7410(k)(2) …………………………...……………………...……………….....19

42 U.S.C. § 7410(k)(3)……………………………………………...………...…………2

42 U.S.C. § 7501(1) ……………………………………………………………….....…3

42 U.S.C. § 7502(c)(9) ………………………………………………………….....*passim*

42 U.S.C. § 7511a…………………………………………………………………..…2

42 U.S.C. § 7511a(c)(2)(A)………………………………………………...……..…..3

42 U.S.C. § 7511a(c)(2)(B) …………………………………………………………3

42 U.S.C. §§ 7511a(c)(2)(B)(i) ……………………………………………………3

42 U.S.C. §§ 7511a(c)(2)(B)(ii) …………………………………………………….3

42 U.S.C. § 7511a(c)(2)(C) ……………………………...……………………………3

42 U.S.C. § 7511a(c)(9) ……………………………………………………………4

42 U.S.C. § 7511a(e)(5) …………………………………...…….………………4, 6, 18

42 U.S.C. § 7511a(e)(5)(B) ………………………………………………………5, 16

42 U.S.C. § 7602(k) ……………………………………………………….…...15

42 U.S.C. § 7602(q) ……………………………………………………………15

42 U.S.C. § 7604(a)(1) ………………………………………………………3, 7, 14, 15

42 U.S.C. § 7604(b) ………………………………………………...………….....8

42 U.S.C. § 7604(b)(1)(B) ………………………………………………………8

42 U.S.C. § 7604(f)(4)…………………………………...………...…………..…3, 15

**Regulations**

40 C.F.R. § 50.9(b) (2003) ……………………………………………………….5

40 C.F.R. § 50.15…………………………………………………………………5

40 C.F.R. § 51.112(a) ……………………………………………………………3

40 C.F.R. § 51.1100(o)(13) …………………………………………………………5

40 C.F.R. § 51.1105(a)(1) …………………………………………………..………5

40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*) ……………………………………………….....*passim*

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a) ……………………………………………………….…….13

Fed. R. Civ. P. 56(b) ………………………………………………...….………...13

Fed. R. Civ. P. 56(c)(1)(A) ……………………………………………………….…..13

Fed. R. Civ. P. 56(e) ………………………………………...…………….………14

**Federal Register Notices**

57 Fed. Reg. 13498 (April 16, 1992) …………………………………………….…….4, 16, 20

62 Fed. Reg. 38856 (July 18, 1997) ………………………………………………......5

66 Fed. Reg. 56476 (Nov. 8, 2001) ………………………………………………...12

67 Fed. Reg. 48039 (July 23, 2002) …………………………………………………12

73 Fed. Reg. 16436 (March 27, 2008) …………………….…………………………..5

75 Fed. Reg. 24409 (May 5, 2010) ……………………………………….………......5, 19

76 Fed. Reg. 57846 (Sept. 16, 2011) …………………………………….…………*passim*

76 Fed. Reg. 82133 (December 30, 2011) ………………………………….…….…...12

77 Fed. Reg. 12652 (March 1, 2012) …………………………………………….…….*passim*

81 Fed. Reg. 84481 (November 23, 2016) ………………………………………….…12

1  **I.      Introduction.**

2       Plaintiffs Central California Environmental Justice Network, *et al.* (collectively "Valley EJ

3  Organizations") filed this Clean Air Act citizen suit to compel Defendants to comply with a commitment

4  in the State Implementation Plan. As part of California's plan to meet the 1997 8-hour ozone National

5  Ambient Air Quality Standard in the San Joaquin Valley, the California Air Resources Board ("CARB")

6  promised it would develop, adopt, and submit by 2020 attainment contingency measures. Congress

7  mandated contingency measures as part of the Clean Air Act's remedial scheme because it wanted a

8  fully adopted back-up plan – a Plan B – if an attainment plan's primary strategy fails. With a 2024

9  attainment deadline looming and ozone pollution levels well above the 1997 8-hour standard,

10  Defendants admit that the commitment is part of the State Implementation Plan and that CARB has not

11  adopted and submitted the attainment contingency measures to the U.S. Environmental Protection

12  Agency ("EPA").

13       The Valley has "long been 'an area with some of the worst air quality in the United States,' and

14  it has repeatedly failed to meet air quality standards." *Association of Irritated Residents v. U.S.*

15  *Environmental Protection Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Committee for a Better*

16  *Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015)). Because of this history of failure, and because of

17  the significant public health impacts caused by ozone pollution, San Joaquin Valley communities

18  especially need the agency charged with reducing air pollution to keep its promises. In situations such as

19  this, the Clean Air Act authorizes Valley EJ Organizations to bring an action and compel state officials

20  to comply with federal law. Because there are no genuine issues of material fact, this Court should enter

21  judgment in favor of Valley EJ Organizations, declare that Defendants have a duty to develop, adopt,

22  and submit attainment contingency measures, declare that Defendants and have violated and continue to

23  violate that duty, and order Defendants to adopt and submit the measures.

24  **II.     Statement of Issues.**

25       1.      Whether the commitment in the State Implementation Plan to develop, adopt, and

26            submit by 2020 attainment contingency measures and advanced technology

27            contingency measures is an emission standard or limitation and an enforceable

28            strategy.

2.      Whether Defendants violated an emission standard or limitation when Defendants failed to develop, adopt, and submit attainment contingency measures.

3.      Whether the Court should order Defendants to develop, adopt, and submit the attainment contingency measures.

## III.     Statutory Background.

Congress enacted the Clean Air Act to promote the public health and welfare and help areas like the San Joaquin Valley which suffer from elevated levels of ozone and other pollutants. 42 U.S.C. § 7401. To achieve its objectives, Congress created a system of "cooperative federalism." *See Vigil v. Leavitt*, 381 F.3d 826, 830 (9th Cir. 2004). The Act makes "the States and the Federal government partners in the struggle against air pollution." *General Motors Corp. v. U.S.*, 496 U.S. 530, 532 (1990).

The Act directs the EPA to establish National Ambient Air Quality Standards ("standards" or "NAAQS") sufficient "to protect public health" with "an adequate margin of safety." 42 U.S.C. § 7409. An area that does not meet the standards is called a "nonattainment area." *Sierra Club v. EPA*, 671 F.3d, 955, 958 (9th Cir. 2012). The Act further subdivides ozone nonattainment areas into classifications of "marginal," "moderate," "serious," "severe" and "extreme" based on the severity of the ozone pollution problem. *Id.*; 42 U.S.C. § 7511a. The Act's remedial scheme relies on states to develop the plans and strategies – collectively called the State Implementation Plan ("SIP") – for reducing emissions to attain the health-based national standards. 42 U.S.C. § 7410(a)(1); *see also Association of Irritated Residents v. EPA*, 686 F.3d 668, 671 (9th Cir. 2012) ("states have primary responsibility . . . and must detail their efforts in a [SIP] for each region within that state"). These plans and strategies must meet certain minimum requirements, and Congress directed EPA to review each plan and strategy to ensure compliance. 42 U.S.C. § 7410(k). If the plans and strategies comply with the Act, then EPA shall approve them as part of the State Implementation Plan. 42 U.S.C. § 7410(k)(3).

Upon EPA approval, a state's submission "bec[o]me[s] *federal* law ..., and c[annot] be changed unless and until EPA approve[s] any change." *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1096 (9th Cir. 2007) (emphasis original). A SIP "once adopted by a state and approved by the EPA, becomes controlling and must be carried out by the state." *Friends of the Earth v. Carey,* 535 F.2d 165, 169 (2nd

Cir. 1976). Citizens may enforce an emission standard or limitation, which the Act defines to include the

standards, limitations, or schedules in the SIP. 42 U.S.C. § 7604(a)(1), (f)(4). While citizens may

enforce the strategies in a SIP, citizens may not enforce a SIP's aspirational goals and objectives.

*Bayview Hunters Point Community Advocates v. Metropolitan Transp. Comm'n*, 366 F.3d 692, 701 (9th

Cir. 2004) (holding a 15% public transit ridership increase was an unenforceable goal).

The Clean Air Act requires that a state's plan to meet a NAAQS – an attainment plan – includes,

among other requirements, a primary control strategy to meet the standard by the deadline, a

demonstration showing steady progress towards meeting the standard, and contingency measures to

serve as the Plan B. The attainment demonstration requirement ensures that the primary control strategy

will reduce air pollution to meet the relevant standard by the applicable deadline. *See* 42 U.S.C. §

7511a(c)(2)(A); *see also* 40 C.F.R. § 51.112(a) ("Each plan must demonstrate that the measures, rules,

and regulations contained in it are adequate to provide for the timely attainment and maintenance of the

national standard that it implements."). This requirement supports a state's claim that the adopted

control measures provide sufficient emission reductions. *See Sierra Club v. EPA*, 356 F.3d 296, 299

(D.C. Cir. 2004) ("The attainment demonstration is based on the state's control strategy for ozone-

precursor emissions.").

The Reasonable Further Progress requirement directs states to formulate the rollout of an

attainment plan to ensure steady progress towards attainment rather than delaying the tough decisions to

the last minute. Congress defined "Reasonable Further Progress" as follows:

> The term "reasonable further progress" means such annual incremental
> reductions in emissions of the relevant air pollutant as are required by this
> part or may reasonably be required by the Administrator for the purpose of
> ensuring attainment of the applicable national ambient air quality standard
> by the applicable date.

42 U.S.C. § 7501(1). An ozone attainment plan must demonstrate Reasonable Further Progress by

showing that the overall level of air pollution in the area continues to decline according to milestones

every three years. 42 U.S.C. § 7511a(c)(2)(B). Such demonstration must show a minimum rate of

emissions decreases of at least three percent of baseline emissions of NOx or VOC each year or less than

three percent if a state demonstrates all feasible measures are in the plan. 42 U.S.C. §§

7511a(c)(2)(B)(i), (ii); 7511a(c)(2)(C).

The contingency measures serve as a backstop if the attainment plan fails. While an attainment plan must demonstrate that it will attain the standard by the deadline and make steady, Reasonable Further Progress towards attainment, the Act also requires attainment plans to include contingency measures to automatically take effect if the plan fails. Specifically, contingency measures take effect when the attainment plan (1) fails to attain a standard by the attainment deadline; or (2) fails to meet Reasonable Further Progress. Section 172(c)(9) of the Act provides:

> Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

42 U.S.C. § 7502(c)(9); *see also* 42 U.S.C. § 7511a(c)(9) (repeating requirement for contingency measures for failure "to meet any applicable milestone."). EPA interprets contingency measures to provide reductions consistent with Reasonable Further Progress, such that "contingency emissions reductions should be approximately equal to the emissions reductions necessary to demonstrate RFP for one year." 57 Fed. Reg. 13498, 13543-44 (April 16, 1992). That equates to 3 percent of the adjusted base year inventory. *See* 57 Fed. Reg. at 13511; 76 Fed. Reg. 57846, 57863 (Sept. 16, 2011) (describing 3 percent requirement when proposing approval of CARB's commitment to develop, adopt, and submit attainment contingency measures).[1]

For areas classified as an extreme ozone nonattainment area, section 182(e)(5) of the Act allows states to rely on reductions from unidentified "advanced technologies" to demonstrate attainment. 42 U.S.C. § 7511a(e)(5). However, to rely on the advanced technologies provision, section 182(e)(5)(B) requires a state to submit  "enforceable commitments to develop and adopt contingency measures to be

---

[1] Already-implemented control measures do not qualify as contingency measures.  *Bahr v. EPA*, 836 F.3d 1218, 1235-1236 (9th Cir. 2016) ("The statutory language in § 7502(c)(9) is clear: it requires the SIP to provide for the implementation of measures 'to be undertaken' in the future, triggered by the state's failure 'to make reasonable further progress' or to attain the NAAQS."); *see also Association of Irritated Residents*, 10 F.4th at 946 (attempt to circumvent *Bahr* was arbitrary and capricious when the San Joaquin Valley Unified Air Pollution Control District ("District") and CARB paired a nominal contingency measure with surplus reductions from already implemented measures).

implemented as set forth herein if the anticipated technologies do not achieve planned reductions." 42 U.S.C. § 7511a(e)(5)(B).

## IV.    Statement of Facts.

Ground-level ozone is formed by a reaction between nitrogen oxides ("NOx") and volatile organic compounds ("VOC") in the presence of heat and sunlight. 76 Fed. Reg. at 57846. Unlike ozone in the upper atmosphere which is formed naturally and protects the Earth from ultraviolet radiation, ozone at ground level is primarily formed from anthropogenic pollution. *Id.* Exposure to ozone decreases lung function, inflames airways, and exacerbates respiratory disease such as asthma. *Id.* Exposure to ozone increases susceptibility to respiratory infections, medication use, and emergency room and hospital admissions for those with respiratory disease. *Id.* at 57847. Ozone exposure also increases the risk of premature death from heart or lung disease. *Id.* "Children are at increased risk from exposure to ozone because the lungs are still developing, and they are more likely to be active outdoors." *Id.*

On July 18, 1997, EPA promulgated an ozone standard of 0.08 parts per million (80 parts per billion) averaged over an 8-hour period to replace the less stringent 1-hour ozone standard. 62 Fed. Reg. 38856 (July 18, 1997); 40 C.F.R. § 50.9(b) (2003). EPA designated the San Joaquin Valley as an extreme ozone nonattainment area for the 1997 standard and established June 15, 2024 as the attainment deadline. 75 Fed. Reg. 24409 (May 5, 2010).

On April 30, 2007, the District adopted the 2007 Ozone Plan. 76 Fed. Reg. at 57847. On September 27, 2007, CARB adopted the State Strategy for California's 2007 State Implementation Plan. *Id.* at 57848. The 2007 Ozone Plan and the State Strategy comprise the primary strategies for attaining the 1997 8-hour ozone standard.

Effective May 27, 2008, EPA completed a review of the 1997 8-hour ozone standard, found it necessary to lower the ambient concentration of ozone to 0.075 parts per million (75 parts per billion) to protect public health, and promulgated the 2008 8-hour ozone standard. 73 Fed. Reg. 16436 (March. 27, 2008); 40 C.F.R. § 50.15. While EPA revoked the 1997 standard as part of the transition to the 2008 standard, it retained the attainment contingency measures for the 1997 standard as a control to help ensure attainment of the 2008 standard. 40 C.F.R. §§ 51.1100(o)(13), 51.1105(a)(1).

On July 21, 2011, CARB adopted Resolution 11-22 in which CARB committed "to develop,

1  adopt, and submit contingency measures by 2020 if advanced technology measures do not achieve planned

2  reductions." Statement of Undisputed Facts ("SUF"), Fact 1. In the proposed approval of the attainment

3  plan, EPA interpreted this commitment as including both attainment contingency measures meeting the

4  requirements of section 172(c)(9) and the advanced technology contingency measures. *See* 76 Fed. Reg.

5  at 57864. EPA proposed to approve the attainment contingency measures based on CARB's

6  commitment to adopt attainment contingency measures and "the continuing implementation of both on-

7  and off-road motor vehicle controls," the latter of which equates to reductions of "2 [tons per day] of

8  NOx and less than 0.5 [tons per day] of VOC." *Id*.

9       CARB affirmed that EPA correctly interpreted the commitment. On November 18, 2011, CARB

10  sent a letter to EPA stating that "ARB would like to clarify that the enforceable commitment made by

11  ARB includes an enforceable commitment, in accordance with sections 172(c)(9) and 182(e)(5) of the

12  Clean Air Act, to adopt and implement specific contingency measures to be undertaken if the South

13  Coast or San Joaquin Valley nonattainment areas fail to attain the national 8-hour ambient air quality

14  standard for ozone by the applicable attainment date." SUF, Fact 2.

15      On March 1, 2012, EPA approved the commitment to develop, adopt, and submit by 2020

16  attainment contingency measures meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9),

17  and the advanced technologies contingency measures required by section 182(e)(5) of the Act, 42 U.S.C.

18  § 7511a(e)(5). 77 Fed. Reg. 12652, 12670 (March 1, 2012). EPA referred to the November 18, 2011

19  letter confirming its interpretation of the commitment. 77 Fed. Reg. at 12664. EPA also identified the

20  commitment in the State Implementation Plan:

21          Commitment to develop, adopt and submit by 2020 contingency measures
            to be implemented if advanced technology measures do not achieve the
22          planned reductions and attainment contingency measures meeting the
            requirements of CAA 172(c)(9), pursuant to CAA section 182(e)(5) as
23          given on page 4 [of Resolution 11-22].

24  77 Fed. Reg. at 12672; 40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*). Defendants admit the commitment is part of

25  the State Implementation Plan. *See* Joint Scheduling Report at 2:22-23 (Dkt. No. 16).

26      On November 21, 2019, CARB adopted the Progress Report on San Joaquin Valley Emissions

27  Reductions for the 0.08 Parts Per Million 8-Hour Ozone Standard ("Progress Report") and Resolution

28  19-25. SUF, Fact 3. The Progress Report states that "NOx emissions reductions needed for attainment in

2023 can be met with defined CARB and District measures adopted since the 2007 Ozone Plan was submitted to U.S. EPA, eliminating the need to rely on advance technology measures and to provide contingency measures under section 182(e)(5)." SUF, Fact 4. The Progress Report also states that "CARB and the District recognize that attainment contingency to satisfy Act [sic] section 172(c)(9) is still required." SUF, Fact 5. Resolution 19-25 states that the Progress Report "demonstrates the Section 185(e)(2)(B) requirements of the Act no longer apply to the [San Joaquin] Valley for the 8-hour ozone NAAQS." SUF, Fact 6.

On December 31, 2019, the CARB submitted Resolution 19-25 and the Progress Report to EPA as a SIP revision. SUF, Fact 7.

CARB has not developed, adopted, and submitted the attainment contingency measures meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9). SUF, Fact 8. An email dated July 27, 2022 from the CARB Branch Manager for the Air Quality Planning Branch states "we still owe regular attainment contingency measures for this standard." *Id*. Defendants admit that CARB has failed to adopt the measures. *Id*.

### V.    Jurisdiction and Standing.

This Court has jurisdiction under the Clean Air Act's citizen suit provision.

> [A]ny person may commence a civil action on his own behalf against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter[.]

42 U.S.C. § 7604(a)(1). The Complaint alleges that the CARB chair, its board members, and its Executive Officer, acting in their official capacities, and the District have violated an emission standard or limitation by violating the commitment to develop, adopt, and submit by 2020 attainment contingency measures meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9). Complaint ¶¶ 57-63 (Dkt. No. 1). The Complaint prays for prospective injunctive and declaratory relief to remedy the alleged violation. Complaint, Prayer for Relief ¶¶ A, B.

The Court has jurisdiction over the CARB chair, its board members, and its Executive Officer, acting in their official capacities pursuant to the exception to the Eleventh Amendment as established in *Ex*

*Parte Young*, 209 U.S. 923 (1908). Under this doctrine, plaintiffs can sue state officers acting in their official capacities for prospective injunctive and declaratory relief to end ongoing violations of federal law. *Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d 858, 865-866 (9th Cir. 2016) (allowing prospective injunctive and declaratory relief claims alleging university officials violated the First Amendment). The *Ex Parte Young* doctrine applies in citizen suits enforcing federal environmental laws. *See Natural Resources Defense Council v. California Department of Transportation*, 96 F.3d 420, 424 (9th Cir. 1996) (district court had jurisdiction in a Clean Water Act citizen suit against a state official under *Ex Parte Young*); *Clean Air Council v. Mallory*, 226 F.Supp.2d 705 (E.D. Penn. 2002) (district court had jurisdiction in a Clean Air Act citizen suit against state officials alleging a violation of an emission standard or limitation under *Ex Parte Young*).

The Court also has jurisdiction because Valley EJ Organizations have satisfied the notice requirements to bring this action. *See* 42 U.S.C. § 7604(b) (requiring notice at least 60 days prior to filing a citizen suit). Valley EJ Organizations provided notice on July 29, 2022, and filed this action on September 28, 2022. Complaint (Dkt. No. 1); Newell Decl., Exh. 7. Valley EJ Organizations thus filed this action more than 60 days after providing notice. Furthermore, the EPA has not commenced and is not diligently prosecuting a civil action in a court of the United States or a State to require Defendants' compliance with the commitment to develop, adopt, and submit attainment contingency measures. 42 U.S.C. § 7604(b)(1)(B); Newell Decl. ¶ 10.

Finally, Valley EJ Organizations have standing to bring this action. An organization has standing to bring an action on behalf of its members if (1) neither the claim asserted, nor the relief requested requires its members to participate directly in the lawsuit; (2) the organization is seeking to protect interests that are germane to its purpose; and (3) its members would have standing to sue individually. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Here, direct participation of Valley EJ Organizations' members is unnecessary. The interests Valley EJ Organizations seek to protect falls squarely within their missions. *See* Declaration of Nayamin Martinez ¶¶ 3-4; Declaration of Salvador Partida ¶¶ 3-4; Declaration of Kevin Hamilton ¶ 2; Declaration of Veronica Aguirre ¶ 3. Valley EJ Organizations' members also have standing to bring this suit individually. To satisfy the final prong, Valley EJ Organizations must show that (1) at least one of their members has

suffered an "injury in fact;" (2) the injury is fairly traceable to Defendants' illegal action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

          A.    **Defendants' failure to develop, adopt, and submit attainment contingency measures injures Valley EJ Organizations' members.**

The first element of the standing inquiry demands that "the [party] must have suffered an 'injury in fact' – an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). The Act creates the legally protected interest in having air pollution reduced to comply with clean air standards. Defendants' failure to develop, adopt, and submit attainment contingency measures injures Valley EJ Organizations' members because Defendants' violation denies the members, already injured by ozone pollution that exceeds the standards, air pollution reductions required by the Act's remedial scheme.

Valley EJ Organizations' members have standing because they "will suffer injury if compelled to breathe air less pure than that mandated by the Clean Air Act." *Natural Resources Defense Council v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974) (citations omitted). The evidence of exposures exceeding the ozone standard demonstrates that Valley EJ Organizations' members suffer "concrete," "particularized" and "imminent" injuries from air pollution that violate clean air standards. *See, e.g., Association of Irritated Residents v. C&R Vanderham Dairy*, 2007 WL 2815038 *15 (E.D. Cal. Sept. 25, 2007). Injury in fact from air pollution has been so obvious that courts routinely proceed to the merits without a standing discussion. *See El Comité para el Bienestar de Earlimart v. Helliker*, 416 F.Supp.2nd 912, 916 n.3 (E.D. Cal. 2006) ("Defendants do not challenge plaintiffs' standing, nor could they reasonably do so."); *Ober v. EPA,* 84 F.3d 304, 307 (9th Cir. 1996); *Hall v. EPA,* 273 F.3d 1146, 1155 (9th Cir. 2001); *Abramowitz v. EPA,* 832 F.2d 1071 (9th Cir. 1987); *Delaney v. EPA,* 898 F.2d 687 (9th Cir. 1990). In addition, aesthetic injury confers standing. *Laidlaw*, 528 U.S. at 183.

Valley EJ Organizations' members currently reside, work, raise their families, and recreate in the San Joaquin Valley. Martinez Decl. ¶¶ 5, 9, 10; Partida Decl. ¶ 6; Hamilton Decl. ¶¶ 3, 10; Aguirre Decl. ¶ 5, 7. Valley EJ Organizations' members allege concrete injuries because, as residents of areas affected by

the Plan, they are "compelled to breathe" levels of ozone that exceed the standard EPA promulgated to protect public health. *Natural Resources Defense Council*, 507 F.2d at 910; Martinez Decl. ¶¶ 6, 9, 12; Partida Decl. ¶¶ 7, 9-10; Hamilton Decl. ¶¶ 10-11, 14-19; Aguirre Decl. ¶¶ 6-7, 10. Valley EJ Organizations' members aver that when they breathe the air on high pollution days it causes them various concrete and tangible forms of physical injury and discomfort. Martinez Decl. ¶ 9; Partida Decl. ¶ 7; Hamilton Decl. ¶ 10, 13; Aguirre Decl. ¶ 6-7. Valley EJ Organizations' members curtail physical exercise and outdoor activities due to high pollution concentrations, lessening their quality of life and impairing recreational opportunities. Martinez Decl. ¶¶ 9-10; Hamilton Decl. ¶ 13; Aguirre Decl. ¶ 7. Valley EJ Organizations' members are concerned by the ozone they and their families experience and are physically and aesthetically harmed by ozone pollution. Martinez Decl. ¶¶ 6, 7, 10; Partida Decl. ¶ 7; Hamilton Decl. ¶¶ 10, 14-21; Aguirre Decl. ¶¶ 6-8. These declarations provide "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001).

Valley EJ Organizations' members also incur injury from the cost of medical treatment, medicine, and other economic harms resulting from ozone pollution. Martinez Decl. ¶¶ 7-8; Hamilton Decl. ¶ 22. Ozone pollution injures a member of Medical Advocates for Healthy Air, as a medical professional specializing in the treatment of respiratory disease and San Joaquin Valley air quality, because of the well-founded concern that levels of ozone pollution in the San Joaquin Valley harm his patients and the general public. Hamilton Decl. ¶¶ 2-8, 10-11, 19.

Valley EJ Organizations members' injuries are also "particularized" because each of their members experience a unique personal harm from exposure to ozone. *Lujan,* 504 U.S. at 561, n.1 ("particularized" means that "the injury must affect the plaintiff in a personal and individual way"); Martinez Decl. ¶¶ 6-10; Partida Decl. ¶ 7; Hamilton Decl. ¶¶ 2-8, 10-22; Aguirre Decl. ¶¶ 5-8. Although the injuries caused by air pollution may be shared by millions of other people in the San Joaquin Valley, that does not deprive each injured person of a particularized injury. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("The fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *United States v. SCRAP*, 412 U.S. 669, 687 (1973) ("Standing is not to be denied simply because many people suffer the

same injury."); *accord Warth v. Seldin,* 422 U.S. 490, 501 (1975).

Valley EJ Organizations members' injuries are actual and imminent, and not conjectural or hypothetical. The ozone air pollution in the San Joaquin Valley harms Valley EJ Organizations' members now while Defendants unlawfully withhold contingency measures.

> B.   Valley EJ Organizations members' injuries are fairly traceable to Defendants' failure to develop, adopt, and submit attainment contingency measures.

The Valley EJ Organizations also satisfy the traceability requirement for standing. The causation test requires that "the injury is fairly traceable to the challenged action of the defendant." *Bernhardt v. County of Los Angeles,* 279 F.3d 862, 868 (9th Cir. 2002) (quoting *Laidlaw).* "An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation 'are not hypothetical or tenuous and remain plausible.'" *Association of Irritated Residents*, 10 F.4th at 943 (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011)). In cases involving a failure to fully implement remedial statutes, the Ninth Circuit has not required a showing that the agency action causes the environmental harm. Rather, causation arises from an agency's failure to implement the remedial scheme. *See Biodiversity Legal Foundation v. Badgley,* 309 F.3d 1166, 1172 (9th Cir. 2002) (causation sufficient for standing based on an agency's failure to implement the remedial steps required by the Endangered Species Act because the agency's failure "will result in continued threats to [species] existence."). Finally, the unlawful denial of attainment contingency measures need not be the sole cause of AIR's injuries to establish causation. *See, e.g., Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990) (defendant's conduct need only contribute to injury suffered).

The physical, economic, and aesthetic harms suffered by Valley EJ Organizations' members are traceable to Defendants' unlawful conduct. Defendants have withheld attainment contingency measures required by the Act and the EPA-approved State Implementation Plan. *See* 42 U.S.C. § 7509(c)(9); 40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*). Defendants' failure to develop, adopt, and submit attainment contingency measures denies Valley EJ Organizations' members the emission reduction benefits from the mechanism Congress required. This failure to implement the remedial scheme thus establishes traceability. *Biodiversity Legal Foundation,* 309 F.3d at 1172.

Valley EJ Organizations' members are aware of the San Joaquin Valley's history of failure, current ozone pollution levels, and want the pollution reductions that contingency measures would provide to improve air quality in the Valley. Martinez Decl. ¶¶ 11-13; Partida Decl. ¶¶ 8-11; Hamilton Decl. ¶¶ 23-25; Aguirre Decl. ¶¶ 10-11. The EPA has found that the Valley has failed to attain several National Ambient Air Quality Standards by their respective deadlines. *See* 66 Fed. Reg. 56476 (Nov. 8, 2001) (1-hour ozone standard failure to attain by 1999); 67 Fed. Reg. 48039 (July 23, 2002) (PM-10 standard failure to attain by 2001); 76 Fed. Reg. 82133 (December 30, 2011) (1-hour ozone standard failure to attain by 2010); 81 Fed. Reg. 84481 (November 23, 2016) (1997 24-hour and annual PM2.5 standards failure to attain by 2015). Moreover, ozone levels remain well above the 1997 8-hour ozone standard with progress towards attainment plateauing. EPA data show design values for 2018-2020 and 2019-2021 remaining flat at 0.93, well above the 0.84 design value necessary to attain the standard. Martinez Decl. ¶ 12; Partida Decl. ¶ 10; Hamilton Decl. ¶ 24; Aguirre Decl. ¶ 10.

The injury here from CARB's failure to adopt attainment contingency measures for the San Joaquin Valley neither presents a hypothetical nor tenuous chain of causation. The Ninth Circuit rejected a causation-based standing argument raised by the District in the recent petition for review challenging EPA's approval of contingency measures for the 2008 8-hour ozone standard that only provided a fraction of the required reductions. *Association of Irritated Residents*, 10 F.4th at 944. The District argued that the "contingency measure has not yet been activated, so its implementation is merely 'hypothetical.'" *Id*. at 943. The Ninth Circuit held that the petitioner had established both causation and redressability. *Id*. at 944. "The threat that the Valley will continue to fail to meet the ozone standard – and therefore that the contingency measure will be activated – is neither conjectural nor hypothetical, but a reasonable inference from the historical record." *Id*. The reasoning of *Association of Irritated Residents* applies with equal force here.

C.     The relief sought will redress Valley EJ Organizations members' injuries.

A favorable order by this Court will redress Valley EJ Organizations members' injuries. An injunction that requires Defendants to develop, adopt, and submit attainment contingency measures would redress Valley EJ Organizations members' physical, economic, and aesthetic injuries. Such measures would reduce ozone-forming emissions by three percent of baseline emissions, or

approximately 17 tons per day of NOx or 14 tons per day of VOC. *See* Section VI.D, *infra*. This reduction in ozone-forming air pollution would redress the members' injuries. *Association of Irritated Residents*, 10 F.4th at 944; *Larson v. Valente,* 456 U.S. 228, 244, n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury").

**VI.     Argument.**

      A.     Summary judgment standard.

A "party may file a motion for summary judgment at any time until 30 days after the close of all discovery." FED. R. CIV. P. 56(b). Under Federal Rule of Civil Procedure 56, summary judgment must be granted when, viewing the facts in the light most favorable to the nonmoving party, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable trier of fact to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact. *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 885 (9th Cir. 2019) (citing *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017)). Once the moving party has satisfied this burden, it is entitled to summary judgment if the nonmoving party fails to cite "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *accord* FED. R. CIV. P. 56(c)(1)(A).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion for summary judgment" and bears the burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its

own evidence "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists." FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. "To demonstrate a genuine issue, the opposing party 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

> **B.** The commitment to develop, adopt, and submit by 2020 attainment contingency measures and advanced technology contingency measures is an emission standard or limitation and an enforceable SIP strategy.

EPA approved the commitment to adopt attainment contingency measures and advanced technology contingency measures as part of the State Implementation Plan. The Act authorizes an action against Defendants alleging a violation of an emission standard or limitation. 42 U.S.C. § 7604(a)(1). Valley EJ Organizations may therefore enforce the commitment as an emission standard or limitation and an enforceable strategy.

On July 21, 2011, CARB adopted Resolution 11-22 and "a commitment by the State to develop, adopt, and submit contingency measures by 2020 if advanced technology measures do not achieve planned reductions." SUF, Fact 1. EPA proposed to approve the attainment contingency measures in the attainment plan based on the commitment in Resolution 11-22 to adopt attainment contingency measures and "the continuing implementation of both on- and off-road motor vehicle controls", the latter of which equates to reductions of "2 [tons per day] of NOx and less than 0.5 [tons per day] of VOC." 77 Fed. Reg. at 57864. In a letter dated November 18, 2011, CARB affirmed EPA's interpretation of Resolution 11-22 as including a commitment to adopt attainment contingency measures meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9). SUF, Fact 2.

Effective April 30, 2012, the EPA approved the commitment to develop, adopt, and submit by 2020 attainment contingency measures and advanced technology contingency measures. 77 Fed. Reg. at 12670. EPA identified the commitment as part of the California SIP. *Id*.

> CARB Resolution No. 11–22, July 21, 2011. Commitment to develop,
> adopt and submit by 2020 contingency measures to be implemented if
> advanced technology measures do not achieve the planned reductions and
> attainment contingency measures meeting the requirements of CAA
> 172(c)(9), pursuant to CAA section 182(e)(5) as given on page 4.

40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*). Defendants concede the commitment is part of the SIP. *See* Joint

Scheduling Report at 2:22-23 (Dkt. No. 16). The identification of the EPA-approved commitment in the

California SIP makes the commitment enforceable. *See El Comité para el Bienestar de Earlimart v.*

*Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008) (40 C.F.R. § 52.220 did not reference a commitment in

the Wells Memorandum to limit VOC from pesticides and thus the commitment was not enforceable).

Once approved by EPA as part of the SIP, CARB's commitment to develop, adopt, and submit

attainment contingency measures became enforceable as an emission standard or limitation. 42 U.S.C. §

7604(a)(1). The Act defines "emission standard or limitation" to include "any other standard, limitation,

or schedule established . . . under any applicable State implementation plan approved by the

Administrator." 42 U.S.C. § 7604(f)(4). The Act further defines the terms "emission standard" and

"emission limitation" as "a requirement established by the State or the Administrator which limits the

quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. §

7602(k). The Act defines "an appliable state implementation plan" to mean "the portion (or portions) of

the implementation plan, or most recent revision thereof, which has been approved under section

7410 of this title[.]" 42 U.S.C. § 7602(q). The commitment to adopt attainment contingency measures

meets this broad definition when the measures will limit ozone-forming emissions and EPA has

approved the commitment as part of the State Implementation Plan.

While the Act does not list a commitment to adopt measures within the definitions, courts have

deferred to EPA's interpretation of the Act allowing states to make enforceable commitments as part of

the control measures, means, techniques, and schedules of compliance in their SIPs. *See BCCA Appeal*

*Group v. U.S. EPA*, 355 F.3d 817, 840-841 (5th Cir. 2003); *Environmental Defense Fund v. EPA*, 369

F.3d 193, 209 (2d Cir. 2004). The Ninth Circuit relied on these two decisions when it upheld CARB

commitments as part of the same attainment plan at issue in this case. *See Committee for a Better Arvin*

*v. U.S. EPA*, 786 F.3d 1169, 1179-1180 (9th Cir. 2015).[2]

---

[2] Congress specifically required an enforceable commitment to adopt the contingency measures

Such commitments to adopt attainment contingency measures and advanced technology contingency measures are also enforceable strategies, and not unenforceable goals. In *Committee for a Better Arvin*, the Ninth Circuit held that CARB's commitment to achieve specific emissions reductions by a specific date was an enforceable strategy. *Committee for a Better Arvin*, 786 F.3d at 1179. At issue was whether so-called "aggregate commitments" to reduce specific amounts of emissions by specific dates were unenforceable goals under *Bayview* when "they contain no specific strategies or measures" and potential measures could fail "so long as the as the aggregate emission reduction commitment is met." *Id.* In rejecting this challenge, the Ninth Circuit first distinguished the unenforceable 15 percent ridership increase in *Bayview* when CARB's commitment used mandatory and non-discretionary language to adopt specific reductions by specific years. *Id.* (citing *Bayview*, 366 F.3d at 698). The Ninth Circuit further held such commitments are enforceable strategies and not merely aspirational goals because "the idea that California can and will propose and adopt emission control measures . . . is plausible and consistent with commitments by other states." *Id.* at 1180 (citing *BCCA Appeal Group*, 355 F.3d at 841 and *Environmental Defense*, 369 F.3d at 209-210).

The commitment to adopt attainment contingency measures as an enforceable strategy aligns with the Ninth Circuit's holding in *Committee for a Better Arvin*. First, the commitment involves a specific quantity of emissions reductions. *Committee for a Better Arvin*, 786 F.3d at 1179-1180. EPA has had a long-standing interpretation of contingency measures equating to one year's worth of Reasonable Further Progress (3 percent of the adjusted base year emissions) and EPA cited that amount in the proposed rule approving CARB's commitment at issue here. 76 Fed. Reg. at 57863; 57 Fed. Reg. at 13543-44. Second, the commitment requires CARB to develop, adopt, and submit the attainment contingency measures by a specific date. *Committee for a Better Arvin*, 786 F.3d at 1180; 40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*) (2020 deadline to develop, adopt, and submit attainment contingency measures).

Accordingly, EPA approved the commitment to develop, adopt, and submit attainment contingency measures as part of the SIP, and the commitment is both an emission standard or limitation

---

as part of the state's reliance on advanced technology measures in section 182. *See* 42 U.S.C. § 7511a(e)(5)(B) (advanced technologies provision authorized if "the State has submitted enforceable commitments to develop and adopt contingency measures to be implemented as set forth herein if the anticipated technologies do not achieve planned reductions").

1  and an enforceable strategy. The Court should grant this motion because this issue presents no genuine

2  issue of material fact.

3          C.      Defendants violated an emission standard or limitation when Defendants failed to
                   develop, adopt, and submit attainment contingency measures.
4

5          This Court should grant this motion because (1) the SIP requires CARB to develop, adopt, and

6  submit by 2020 attainment contingency measures; and (2) CARB has failed to comply. Shortly before the

7  2020 deadline, CARB disavowed reliance on the advanced technology measures and conceded that CARB

8  still must adopt the attainment contingency measures. SUF, Facts 4-6. More than two years later and two

9  days before Valley EJ Organizations sent the notice letter, the CARB Branch Manager for the Air Quality

10 Planning Branch wrote in an email that "we still owe regular attainment contingency measures for this

11 standard." SUF, Fact 8; Newell Decl. Exh. 6. Defendants admit that CARB has failed to comply with the

12 commitment to develop, adopt, and submit attainment contingency measures. SUF, Fact 8. Because no

13 genuine issue of material fact exists to preclude summary judgment, this Court should grant the motion

14 because the SIP requires CARB to act, and CARB has failed to comply.

15         First, the SIP requires CARB to develop, adopt, and submit by 2020 the attainment contingency

16 measures. In interpreting the SIP, this Court should first "look toward the plain meaning of the plan and

17 stop there if the language is clear." *Safe Air*, 488 F.3d at 1095 (citing *Bayview*, 366 F.3d at 698). The

18 plain meaning of Resolution 11-22 commits CARB to adopting "contingency measures by 2020 if

19 advanced technology measures do not achieve planned reductions." SUF, Fact 1. This language suffers

20 from ambiguity by neglecting to specify which contingency measures CARB committed to adopt. EPA,

21 supported by CARB's November 18, 2011 letter (SUF, Fact 2), interpreted Resolution 11-22 as including

22 a commitment to develop, adopt, and submit attainment contingency measures. *See* 76 Fed. Reg. at 57864;

23 77 Fed. Reg. at 12670, ¶ 5; 40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*).

24         When a SIP is ambiguous, the Court should defer to EPA's interpretation of the regulation if the

25 interpretation is reasonable.[3] In *El Comité para el Bienestar de Earlimart v. U.S. Environmental*

26 _____

27         [3] Even if plain meaning of Resolution 11-22 unambiguously excludes attainment contingency
   measures, then this Court applying *Safe Air* should still conclude that the SIP requires attainment
   contingency measures. If the SIP is not ambiguous, then the plain meaning does not control if clearly
28 expressed administrative intent, referenced in the published rulemaking notices, is to the contrary or
   would lead to absurd results. *Safe Air*, 488 F.3d at 1097-1098. EPA's interpretation in the proposed and

*Protection Agency*, the community groups challenged an EPA rulemaking that interpreted the Pesticide Element in the California SIP. 786 F.3d 688, 696 (9th Cir. 2015). The Ninth Circuit concluded that the Pesticide Element was internally contradictory and ambiguous when it described the commitment's percentage reduction. *Id*. (finding the commitment referenced both a 12 and a 20 percent reduction commitment). The court then deferred to EPA's reasonable interpretation that the commitment required a 12 percent reduction in the San Joaquin Valley. *Id*. at 697.

This Court should likewise defer to EPA's reasonable interpretation of the ambiguous commitment in Resolution 11-22. EPA offered its interpretation at the same time EPA approved the commitment. EPA interpreted the provision authorizing advanced technologies to allow for CARB to commit to adopt both attainment contingency measures required by section 172(c)(9), 42 U.S.C. § 7502(c)(9), and the advanced technology contingency measures required by section 182(e)(5), 42 U.S.C. § 7511a(e)(5). 76 Fed. Reg. at 57864. EPA explained that CARB submitted a commitment to adopt *both* attainment contingency measures and advanced technology contingency measures, and cited Resolution 11-22 as the basis for that commitment. *Id*. EPA then proposed to approve the commitment to adopt both types of contingency measures. *Id*. CARB affirmed EPA's interpretation of the commitment prior to EPA's final rule approving the commitment. In a letter dated November 18, 2011, CARB explained that EPA correctly interpreted the commitment as including both attainment contingency measures and advanced technology contingency measures. SUF, Fact 2. In the Final Rule, EPA maintained that interpretation when it approved the commitment to adopt both attainment and advanced technology contingency measures and identified that commitment in the SIP. 77 Fed. Reg. at 12670 (Final Action #5). 40 C.F.R. § 52.220(396)(ii)(A)(*2*)(*i*).

CARB reiterated its understanding that EPA's interpretation was correct several years later and shortly before the 2020 deadline to adopt the attainment contingency measures. On November 21, 2019, CARB adopted Resolution 19-25 and the Progress Report. SUF, Fact 3. Resolution 19-25 and the

---

final rule demonstrates EPA's understanding and intent to approve a commitment that included both attainment contingency measures and advanced technology contingency measures. This administrative intent should control, especially since CARB's November 18, 2011 letter affirmed EPA's intent. Moreover, it would be absurd to interpret the SIP without provisions for attainment contingency measures.

Progress Report disavowed reliance on the section 182(e)(5) advanced technology measures. SUF, Facts 4 and 6. However, the Progress Report conceded that CARB remained bound by the commitment to adopt attainment contingency measures. "CARB and the District recognize that attainment contingency to satisfy Act [sic] section 172(c)(9) is still required." SUF, Fact 5. Defendants concede that the commitment is part of the SIP. *See* Joint Scheduling Report at 2:22-23 (Dkt. No. 16).

Second, CARB has not developed, adopted, and submitted the attainment contingency measures as required by the State Implementation Plan. SUF, Fact 8. CARB admits it has failed to adopt the measures, and thus no genuine issue of material fact exists. *Id*. The Court should grant this motion.

  D. The Court should order Defendants to develop, adopt, and submit attainment contingency measures.

This Court should enter judgment and order Defendants to develop, adopt, and submit the attainment contingency measures within 180 days. "Once a citizen suit to enforce an EPA-approved state implementation plan has been properly commenced, the district court is obligated, upon a showing that the state has violated the plan, to issue appropriate orders for its enforcement." *Friends of the Earth*, 535 F.2d at 173. Unless and until EPA approves a revision to the SIP, "the State is relegated to a lone option: compliance." *Id*. at 178; *Safe Air*, 488 F.3d at 1096. Accordingly, the Court should order Defendants to adopt and submit the measures meeting the requirements of section 172(c)(9), 42 U.S.C. § 7502(c)(9), as authorized by the Act's citizen suit provision, 42 U.S.C. § 7604(a), and the *Ex Parte Young* doctrine.

The order should ensure that the contingency measures will take effect without further action by CARB and the EPA prior to the attainment deadline. A 180-day period for CARB to comply would afford EPA with adequate time prior to June 15, 2024 to review the measures, publish a proposed action in the Federal Register, provide a 30-day public comment period, consider the comments, and then publish its response to comments and final rule in the Federal Register. *See* 42 U.S.C. § 7410(k)(2) (providing one year for EPA to act on a complete submission); 75 Fed. Reg. at 24415 (establishing June 15, 2024 as the attainment deadline for the 1997 8-hour ozone standard in the San Joaquin Valley). Adoption by CARB and action by EPA should conclude before the attainment deadline because Congress wanted attainment contingency measures to take effect upon a failure to attain the standard without any further agency action. 42 U.S.C. § 7502(c)(9) ("Such measures shall be included in the plan revision as contingency measures to

take effect in any such case without further action by the State or the Administrator.") Because Congress wanted the attainment contingency measures in place prior to the attainment deadline, the Court should issue an order that ensures adequate time for EPA action after Defendants adopt and submit the measures. *See United States v. Oakland Cannabis Buyers' Co-Op.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute"). Therefore, a 180-day period for Defendants to adopt and submit the measures would ensure EPA has sufficient time to act so that the measures can take effect upon a failure to attain.

The Court should order these contingency measures to provide one year's worth of Reasonable Further Progress, or three percent of the adjusted base year emissions. 76 Fed. Reg. at 57863; 57 Fed. Reg. at 13511. The adjusted 2002 base year emissions inventory are 565.2 tons per day of NOx and 457.5 tons per day of VOC. 76 Fed. Reg. at 57858 Table 9 and 57861 (describing the base year as 2002). Three percent of the adjusted base year inventory for NOx and VOC equates to 16.956 and 13.725 tons per day, respectively. EPA had approved 2 tons per day of NOx reductions and less than 0.5 tons per day of VOC reductions from already implemented on- and off-road vehicle controls as attainment contingency measures. 76 Fed. Reg. at 57864; 77 Fed. Reg. at 12670. However, those reductions from already implemented measures no longer qualify as attainment contingency measures. *Bahr*, 836 F.3d at 1235-1236; *Association of Irritated Residents*, 10 F.4th at 946. Thus, the Court should order Defendants to adopt the measures to achieve reductions that amount to 3 percent of the adjusted 2002 base year inventory.

## VII.    Conclusion.

For the foregoing reasons, the Court should grant the Motion for Summary Judgment, enter judgment in favor of Valley EJ Organizations, declare that Defendants violated their duty to develop, adopt, and submit attainment contingency measures, and order Defendants to develop, adopt, and submit the measures within 180 days.

Dated:  November 28, 2022                    Respectfully Submitted,


                                             /s/ Brent J. Newell
                                             Brent J. Newell
                                             Attorney for Plaintiffs
                                             Central California Environmental Justice Network, *et al.*

1

2

**CERTIFICATE OF SERVICE**

3

4

5

      I hereby certify that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system on November 28, 2022, which will send notification of said filing to the attorneys of record, who are required to have registered with the Court's CM/ECF system.

6

7

/s/ Brent Newell
Brent Newell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28